Louis WHATLEY, Plaintiff,

v.

SKAGGS COMPANIES, INC., Defendant.

Civ. A. No. 76–C–449.

United States District Court,
D. Colorado.

Nov. 25, 1980.

Paul A. Baca, Denver, Colo., for plaintiff.

Earl K. Madsen, Bradley, Campbell & Carney, Golden, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CARRIGAN, District Judge.

This action was filed pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e, *et seq.*, as amended, and 42 U.S.C. Section 1981, the Civil Rights Act of 1870. The plaintiff, Louis Whatley, claims that he was demoted from his in-store managerial position with defendant Skaggs Companies, Inc. ("Skaggs") because of his status as a Mexican American. Skaggs is an employer within the meaning of 42 U.S.C. Section 2000e(b).

### General Background.

Skaggs operates a chain of retail stores. During the time period in question, most of these stores sold prescription drugs, over-the-counter drugs, a variety of household items, and sundries. At that time, Skaggs had ten stores in its Denver district: one in Colorado Springs, two in Pueblo, and seven in the Denver metropolitan area.

Management in each of these stores consisted of a general manager, an assistant general manager, and an assistant (usually referred to as "lobby") manager. The general manager was responsible for the entire store. The assistant general manager was directly responsible for the "drug" area, which constituted the bulk of the sales floor in each store. The lobby manager was directly responsible for the candy, tobacco,

and film counters which were usually located in the front of the store outside the line of cash registers where the checkout lanes ended. The stores were staffed by clerks assigned to the respective areas.

Promotions to the lowest managerial position, lobby manager, were usually made from among the clerks. From the position of lobby manager, one could be promoted to assistant general manager. General managers were selected from the ranks of assistant general managers. Promotions sometimes occurred within the same store, but most often a promotion required transferring to another store in the Skaggs chain.

Recommendations for promotion or demotion were made by a store general manager. These were sometimes accompanied by a recommendation from the store's assistant general manager. Recommendations were always made orally: Skaggs had no formal employee evaluation procedure. Nor were there any written objective standards or tests.

The district manager forwarded recommendations from general managers, with proposed personnel changes, to the home office in Salt Lake City. During the time in question the Denver district manager was Arnold Ford. Ford testified that he consistently supported promotion recommendations made by the general managers under his supervision.

Plaintiff Whatley, an American citizen of Mexican ancestry, was first employed by Skaggs as a clerk at Store No. 22 (the "Lakeside" store) during the 1965 Christmas season. He was then approximately thirty years old.

During January, 1966, Whatley was offered, and accepted, full-time employment as a clerk in that store. The general manager at Skaggs' Lakeside store was then Gus Roe. Whatley worked through 1966 as a sales clerk in the drug area. Sometime during that year, Eldred Jensen became general manager of the Lakeside store. In late 1966 or early 1967, Whatley was involuntarily reassigned, by Jensen, to the shipping department at Lakeside.

In February 1968, Robert Benedict, general manager of the Federal store, told Jensen that he needed a shipping clerk. Jensen sent Whatley who spent the next year in the shipping department at the Federal store. In early 1969, Whatley requested and received reassignment to the sales floor.

Benedict eventually recommended Whatley to Ford for promotion. In November 1969, Whatley was named lobby manager and reassigned to the Lakeside store where Jensen was still general manager. One Skip Bailey was then assistant general manager. In April or May 1970, Bailey was replaced by Coleman Nay. Jensen and Nay worked on the Lakeside management team with Whatley until Whatley was fired as lobby manager.

Whatley's dismissal took place on Friday morning, September 17, 1971. Without any warning, Whatley was called into Jensen's office at the Lakeside store to meet with Ford and Jensen. Ford peremptorily ordered Whatley to turn over his keys, and informed him that he was no longer a lobby manager. Ford testified that his actions on this occasion terminated Whatley's employment with Skaggs.

Whatley asked why he was being fired. He was told that, in Jensen's opinion, he would never be able to handle the position of general manager of a Skaggs store. Whatley asked for reassignment to another position in the Skaggs organization, and Ford relented, sending him to work in the Skaggs central warehouse for the Denver district.

Whatley remained as a warehouseman with Skaggs until June 8, 1973, when he resigned. He gave as his reason his inability to support his family on his wages. He found part-time employment with King Soopers' Stores, and later with the Denver School District. Whatley eventually found full-time employment with Gold Star Beef Company. However, a 1975 on-the-job back injury at Gold Star resulted in his temporary total disability. Whatley currently suffers a partial disability. He now lives in Mesa, Arizona, in part for health reasons.

## I. *Liability.*

### A. *Title VII.*

To make out a *prima facie* case of Title VII employment discrimination, a plaintiff who has been dismissed from his job must show (1) that he is a member of a protected group, (2) that he was qualified for the position from which he was dismissed, (3) that he was removed from his position, and (4) that he was replaced by someone not a member of the protected group. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The *Green* rule applies where the plaintiff has been dismissed from his job. *See Silberhorn v. General Iron Works Co.*, 584 F.2d 970, 971 (10th Cir. 1978).

After the plaintiff's *prima facie* showing, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for terminating the plaintiff. *Green, supra*, 411 U.S. at 802, 93 S.Ct. at 1824; *Silberhorn, supra*, 584 F.2d at 971. Plaintiff then has the opportunity to rebut this evidence.

Whatley established a *prima facie* case of discrimination by evidence showing that he is of Mexican–American ancestry,[1] that he was qualified to be a lobby manager, that he was terminated, and that he was replaced by Don Bruning, a white male. The burden thus shifted to Skaggs to articulate some legitimate, nondiscriminatory reason for Whatley's termination as lobby manager.

In an attempt to articulate a reason for Whatley's dismissal, Skaggs presented the testimony of Ford, Nay, and Jensen. All three participated in some way in the decision to terminate Whatley. Nay and Jensen both told Ford that Whatley was not performing well enough as lobby manager to continue in the management of a Skaggs store. Based on their opinions, Ford recommended Whatley's termination to his superiors in the Skaggs organization. With his superiors' approval, Ford dismissed Whatley.

It was uncontroverted that Jensen's recommendation was the critical factor in the decision to terminate Whatley: Ford's practice was to base his personnel recommendations to Skaggs management almost entirely upon the recommendation of the general manager with direct supervision of the employee involved. Jensen was questioned repeatedly at trial about the basis for his opinion that Whatley was not qualified to continue as a lobby manager. Invariably, his response was in terms of the generality that Whatley did not have good business sense. When asked what facts about Whatley gave rise to this conclusion, Jensen confessed that it was a "gut reaction."

Jensen did testify that he recalled one or two complaints from customers about Whatley, that Whatley had trouble covering shortages of products specially advertised during a particular week, and that Whatley had trouble scheduling the work of employees under his supervision. However, Jensen's overall recollection during direct and cross–examination was poor. This, coupled with the fact that Whatley offered evidence contradicting each of Jensen's recollections, undermined the credibility of Jensen's testimony as to particular events. His bald conclusion that Whatley lacked good business sense, therefore, is unsupported by any credible evidence.

It is questionable whether, standing alone, Jensen's highly subjective reason for recommending that Whatley be dismissed constitutes a sufficient articulation of a legitimate, nondiscriminatory reason to rebut Whatley's *prima facie* case of discrimination. Nay was also present at the Lakeside store on a daily basis, and had ample opportunity to observe Whatley's job perform-

---

1. Whatley is a native–born American of Mexican descent. His paternal grandfather was part English and part Indian. This accounts for his surname, which admittedly is not of Spanish derivation. His other grandparents were of Mexican ancestry. Whatley was present at counsel table throughout the trial, and testified in his case–in–chief and in rebuttal. Whatley's physical characteristics are such that a reasonable person should recognize that Whatley is of Mexican ancestry. Skaggs did not contest the issue of Whatley's national original at trial.

ance. It is uncertain how much weight Nay's negative impression of this performance carried in the decision to remove Whatley. However, Nay's testimony can at least be treated as an attempt to articulate the reasons for Whatley's dismissal.

Nay is a fifteen–year employee of Skaggs. At the time of trial, Nay was assistant general manager of a Skaggs store in Great Falls, Montana. He held a like position at Lakeside when he worked with Whatley.

The essence of Nay's testimony was that Whatley simply did not do his job. Nay testified that Whatley was unable to prepare displays of merchandise for promotional sales, unable to execute efficiently his daily ordering and pricing responsibilities, and unable to schedule the employees assigned to his department. In addition, Nay testified that Whatley was slow in bringing his merchandise up from the store room, and that Whatley failed to prepare adequately for the quarterly inventory. Nay testified that on several occasions he had to leave his duties in the drug area and assist Whatley in performing tasks that Whatley should have handled on his own.

Jensen's recollection of these events was so vague that he could not corroborate Nay's testimony. Skaggs did offer the testimony of Kathy Romero Parker, who worked for Whatley in the lobby department for a year. Mrs. Parker testified that she often had to work alone as the lobby cashier, though she admitted that Whatley was in the store and available to help her when necessary.

Whatley offered testimony to contradict Nay, as well as testimony to impeach Nay's credibility. Whatley testified that one of the first things he did when he arrived at Lakeside after his promotion was to clean the old displays, build new ones, and paint the lobby area fixtures. It was uncontradicted that Skaggs' policy was to give its lobby managers authority over ordering and pricing of goods, as well as scheduling the employees in the department. This authority was subject to the general manager's power to modify the lobby manager's deci-

sions. One of Whatley's chief contentions throughout his case was that Jensen constantly modified his orders and prices, and that this effectively deprived him of any chance fully to carry out his responsibilities as lobby manager. Whatley's testimony supported this contention.

In addition to contradicting Nay's testimony by his own, Whatley offered the testimony of Howard Juross and Debbie Adams. Both of these witnesses worked at Lakeside in the lobby department while Whatley was lobby manager. Both testified that they had a good work relationship with Whatley, and that his work in the department was done in a satisfactory manner.

Since Whatley's and Skaggs' evidence on these issues is in direct contradiction, their resolution turns on credibility. Skaggs devoted most of its efforts at impeachment to contradiction. The Court finds that Skaggs' other attempts to impeach Whatley's witnesses with deposition testimony and EEOC affidavits failed of its purpose. The inconsistencies uncovered by Skaggs were insubstantial and almost imperceptible.

Whatley, however, offered evidence that both Jensen and Nay had made prior inconsistent statements. The most telling evidence of this kind related to ethnic jokes and slurs uttered by both Jensen and Nay. These will be discussed more fully below. (*see* footnotes 2, 3, and 5). For the purposes of evaluating their credibility, it is sufficient to say that both Jensen and Nay denied making certain jokes and insults when they were cross–examined. Whatley confronted these witnesses with the specific content of the alleged jokes and insults, then offered testimony by himself or Juross that such remarks had been made. From this evidence, the Court finds as a fact that the testimony offered by Skaggs purporting to establish a legitimate, nondiscriminatory reason for Whatley's dismissal is not credible.

■ The defendant's burden in a Title VII Case to rebut a *prima facie* case of discrimination is not heavy. *Board of Trus-*

tees of Keene State College v. Sweeney, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); Silberhorn v. General Iron Works Co., 584 F.2d 970, 971 (10th Cir. 1978). However, to carry its burden the defendant must present evidence that is at least credible. Since Skaggs has not presented credible evidence, it has not articulated any legitimate, nondiscriminatory reason for dismissing Mr. Whatley. Therefore Skaggs has failed to rebut Whatley's prima facie case of discrimination, and Whatley should prevail.

Even if Skaggs had sufficiently articulated a legitimate reason, Whatley has rebutted the defense case by showing that Skaggs discriminated against him in making its decision to discharge him.

As a major aspect of its defense, Skaggs paraded numerous Spanish surnamed male employees into court to testify that they had encountered no discrimination in seeking promotions to managerial positions. These employees testified under the watch-

ful eye of a Skaggs home office executive who sat at defense counsel table throughout the trial. The cumulative effect of their evidence established that Skaggs has no company–wide policy or practice of discriminating against this minority group. This provides little comfort to Whatley, however, for it appears that discrimination played a major part in his firing–demotion. Whatley did not complain of a company–wide policy of discrimination by Skaggs, and thus the Skaggs evidence is simply not responsive.

Whatley proved that both Jensen and Nay used the term "nigger" to refer to Black people,[2] that both Jensen and Nay made ethnic jokes and slurs, some of which were directed at Whatley or his wife,[3] and that Nay had a history of problems with members of minority groups, both employees and customers.[4]

Jensen and Nay contested this evidence, either in whole or in part.[5] Thus resolution

**2.** Jensen used the term in at least one joke, set forth in note 3, below. Whatley testified that Jensen also used the term in asking Whatley if the wife of another employee was a "nigger." This occurred when Whatley was still a clerk at the Lakeside store. Nay apparently used the term "nigger" regularly to refer to a Black person. Juross testified that both Jensen and Nay each used the term "nigger" at least ten times a year.

**3.** It was the testimony of Juross that Jensen once said that every store should have at least one "nigger" to "keep an eye on the others." This statement was allegedly made in Jensen's office. Whatley testified that Nay made several ethnic jokes or slurs. Once, Nay asked Whatley what the difference was between a "Mexican" and a "nigger." Whatley's "I don't know" brought the punchline: "Their hair." Whatley once bought a birthday cake for his daughter. The baker had decorated the cake with the figure of a gingerbread man. Upon seeing the cake, Nay said, "Perfect for a little Mexican baby." This testimony was corroborated by Juross. Whatley's daughter once babysat for Nay; when bringing the girl home on this occasion, Whatley invited Nay into the Whatley home. Whatley testified that Nay said, "You have a nice house for a Mexican." Whatley also testified that Nay once inquired of Whatley if his wife was a "nigger." Nay did not confine his remarks to Blacks and Hispanics. Juross testified that Nay once told him, "If

you don't work faster, we're going to turn up the ovens." Juross is Jewish.

**4.** Whatley testified that Nay once chased a 10–12 year old male Mexican shoplifter out of the store, grabbed him, and began to twist his arm. Nay's response to Whatley's protest was: "Butt out, Lou. I can't stand these Mexican punks." Nay admitted that two other complaints of discrimination had been filed against him, one by a Black man and one by an Hispanic.

**5.** Jensen categorically denied ever using the term "nigger" to refer to anyone in his life, and denied making any of the remarks attributed to him by plaintiff's witnesses. However, Jensen did admit to keeping a picture of Martin Luther King, Jr. in his office for a year. The picture had been sent to him, with the inscription "To Eldred, with love." The picture had not been sent by Dr. King, since Jensen received it several years after King's death.

Nay admitted that he used the term "nigger" to refer to Blacks, and that he made regular use of ethnic "humor." He also admitted making the "ovens" remark to Juross that is described in note 2, above. He admitted that he probably made ethnic jokes to Whatley, but denied making the joke about hair as the only distinguishing features between "niggers" and "Mexicans," and denied making disparaging remarks about plaintiff's wife or their home. Nay denied any recollection of the incident with the birthday cake.

of the issue turned on credibility. The Court finds that Jensen and Nay did make the remarks charged and that Nay did have difficulties in dealing with members of minority groups. From these facts, the Court infers that, absent any other credible explanation, Jensen and Nay made their recommendations that Whatley be dismissed as a result of their prejudice against Whatley because he is a Mexican–American.

This inference of discrimination is buttressed by the circumstances in which Whatley was fired. It would be difficult to imagine a less considerate, more thoughtless, harsh or abrupt manner of dealing with a long term supervisory employee. Neither Jensen nor Nay took the time to discuss with Whatley the alleged deficiencies in his performance which they now assert were responsible for his dismissal. Nor did any of Skaggs' officers or supervisory employees give Whatley any warning that his position was in jeopardy. It seems highly unlikely that if Whatley's job performance had been so inadequate for so long as claimed, he would not have received a reprimand, warning or counselling on how to improve. Rather this Court finds that Skaggs' claims of deficiencies in Whatley's job performance were merely pretextual. The testimony of several Skaggs employees established that warnings were normal procedure. These witnesses were managers all called by Skaggs.

The Court finds and concludes that Whatley has proved his case of a discriminatory job termination, and has established liability under Title VII.

### B. *Section 1981.*

Skaggs has contended since it filed its answer that Whatley's Section 1981 claim is barred by the statute of limitations. Whatley filed his discrimination complaint with the EEOC on September 20, 1971. The EEOC issued a right–to–sue letter on January 27, 1976. Whatley filed this suit on April 23, 1976. His Title VII claim, which had to be filed within ninety days after receipt of the EEOC right–to–sue letter, was timely filed. *See Plunkett v. Roadway Express, Inc.*, 504 F.2d 417 (10th Cir. 1974).

Whatley filed his Section 1981 claim with his Title VII claim on April 23, 1976. His section 1981 claim arose with his termination on September 17, 1971, four years and seven months before he filed his claim. Since a six–year limitations period is applied to Section 1981 claims of employment discrimination that arise in Colorado, his Section 1981 claim was timely filed. *See Zuniga v. AMFAC Foods, Inc.*, 580 F.2d 380, 387 (10th Cir. 1978).

It is clear that a plaintiff may state a claim for relief under 42 U.S.C. § 1981 for acts of discrimination directed against him because he is a Mexican–American. *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979). Discrimination actionable under Section 1981 may occur in the employment context. *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975). Section 1981 provides a basis for relief independent from Title VII. *Id.* at 461, 95 S.Ct. at 1720.

The difference between the discriminatory intent required to recover under Section 1981 and that required to recover under Title VII is not clear. *See Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979). A greater showing of discriminatory intent seems to be required for "constitutional" claims of discrimination than is required for Title VII claims. *Id.* This is so because some Title VII cases do not require a showing by the plaintiff that the defendant employer purposely discriminated against him. *See Washington v. Davis*, 426 U.S. 229, 238, 96 S.Ct. 2040, 2046, 48 L.Ed.2d 597 (1976).

However, Title VII does not require proof of discriminatory intent only when the suit is one for "adverse impact." *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Title VII imposes liability for "adverse impact" when an employer uses some decision–making device that is neutral on its face, but adversely affects the employment of a particular protected group. "Disparate treatment" cases, on the other hand, follow the evidentiary

rule of *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). From an examination of the shifting burdens suggested by *Green* for "disparate treatment" cases, it is apparent that these cases turn on a finding of intentional discrimination. Therefore, the showing of discriminatory intent required to establish Title VII liability under *Green* differs only slightly, if at all, from the showing required to establish Section 1981 liability.

■ Whatley tried and proved his case under Title VII on a theory of "disparate treatment." This Court applied the *Green* rule, and found intentional discrimination from the facts discussed above. This finding supports imposition of Section 1981 liability as well. Therefore, Whatley's proof establishes Section 1981 liability in addition to Title VII liability.

## II. *Remedies.*

■ Whatley was terminated from his position as lobby manager at the Lakeside store on September 17, 1971. Since that termination was an act of intentional discrimination against him because of his national origin, he is entitled to reinstatement to an equivalent position with Skaggs. 42 U.S.C. § 2000e–5(g). Whatley cannot be reinstated to the position he formerly held at Lakeside because Skaggs closed its Lakeside store several years ago.

■ Whatley is also entitled to back pay. The period for which back pay is recoverable commences on September 17, 1971, the date of his termination. Since Whatley filed his charge of discrimination with the EEOC on September 20, 1971, this is well within the statutory limit restricting back pay liability to two years prior to the filing of the charge with the EEOC. *See* 42 U.S.C. § 2000e–5(g).

Skaggs' liability for back pay will terminate on the date Skaggs offers to reinstate Whatley. *See United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 931–32 (10th Cir. 1979); Schlei and Grossman, *Employment Discrimination Law* 1240 (1976). The back pay award will be based on the

salary for an assistant or lobby manager with Skaggs. This amount is to be adjusted for cost-of-living and step increases which have occurred since September 17, 1971. The back pay award is to be reduced by Whatley's earnings during the back pay period, including the amount earned by Whatley while employed in Skaggs' warehouse.

However, the back pay award will not be reduced by Whatley's compensation award for the disability he incurred while working at Gold Star Beef Company. There might be justification for reducing the award by this amount if Whatley had been in Skaggs' employ when the disability occurred, since Skaggs would have paid premiums for disability insurance. *See Equal Employment Opportunity Commission v. Sandia Corp.*, 639 F.2d 600, at 625–626 (10th Cir. 1980).

However, a disability award received as a result of an injury while Whatley was working for another employer is a collateral source. *Id.* at 625. In *Sandia*, the Tenth Circuit affirmed the District Court's refusal to allow a set–off of unemployment benefits against a back–pay award. *A fortiori*, set–off of a disability award cannot be allowed, since it is compensation for an injury entirely different from the loss of employment "cured" by a back–pay award.

■ Skaggs has raised the issue of constructive discharge. This is not a constructive discharge case. A "constructive discharge" is an act of demotion or transfer designed to force an employee to resign. *See Muller v. United States Steel Corp.*, 509 F.2d 923 (10th Cir. 1975). Whatley was terminated–fired–on September 17, 1971 as lobby manager. The testimony of Arnold Ford, the Skaggs employee who terminated Whatley, establishes this. The only reason Whatley continued in Skaggs' employ was his request for some sort of job in the Skaggs organization. He was merely making a diligent attempt to mitigate his damages by seeking reemployment in a lesser capacity. In these circumstances, Whatley's tenure in the Skaggs warehouse has the same legal effect as if he had perma-

378

nently left Skaggs' employ on September 17, 1971, and had found employment elsewhere, later that same day.

Whatley is entitled to reasonable attorney's fees as a prevailing party in a civil action to enforce the provisions of Title VII. *See* 42 U.S.C. § 2000e–5(k). He is also entitled to reasonable attorney's fees as the prevailing party in a civil action to enforce the provisions of Section 1981. *See* 42 U.S.C. § 1988. He is not, however, entitled to a double recovery of attorney's fees. As the prevailing party, Whatley is also entitled to recover his costs.

Accordingly, it is

ORDERED that the Clerk enter judgment for the plaintiff on his claims under Title VII, 42 U.S.C. § 2000e–5, and the Civil Rights Act of 1870, 42 U.S.C. § 1981. The plaintiff must file his claim for attorney's fees within twenty days from the entry of this Order. The defendant may file its objections within ten days after this claim is filed. A hearing will be set upon request of counsel.

FURTHER ORDERED that the parties confer within twenty days following the date of this Order in an attempt to reach an agreement on the proper amount of the back pay award. If no agreement can be reached, the Court will consider appropriate motions as soon as they can be heard on a short notice, priority basis. The Clerk shall withhold entry of final judgment until after the awards of attorney's fees and back pay are determined.