707 F.2d 1129
 31 Fair Empl.Prac.Cas. 1202,
31 Empl. Prac. Dec. P 33,596,
13 Fed. R. Evid. Serv. 133
Louis WHATLEY, Plaintiff-Appellee, and Cross-Appellant,
v.
SKAGGS COMPANIES, INC., Defendant-Appellant, and Cross-Appellee.
 Nos. 81-1303, 81-1357.
 United States Court of Appeals,
Tenth Circuit.
 May 9, 1983.
 
 Earl K. Madsen of Bradley, Campbell & Carney, Golden, Colo., for defendant-appellant, cross-appellee.
 Paul A. Baca, Attorney, Denver, Colo., for plaintiff-appellee, cross-appellant.
 Before SETH, Chief Judge, and HOLLOWAY and McWILLIAMS, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 Defendant-appellant Skaggs Companies, Inc., brings a timely appeal in No. 81-1303 from a judgment, following a trial to the court, in favor of plaintiff-appellee Louis Whatley, a former Skaggs employee, on his employment discrimination claim against defendant for allegedly discriminatory treatment of plaintiff because of his status as a Mexican-American. Plaintiff bases his claims on Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e, et seq.,[1] as amended, and the Civil Rights Act of 1870, 42 U.S.C. Sec. 1981.[2] Plaintiff Whatley cross-appeals in No. 81-1357, asserting error in an off-set against the back pay award, exclusion of profit-sharing income from the award, and failure to award interest.
 
 
 2
 The district court entered findings, conclusions, and judgment for plaintiff and further ordered that the parties confer in an attempt to reach an agreement on the proper amount of back pay to be awarded. 502 F.Supp. 370. The court withheld entry of final judgment until after determination of back pay and attorney's fees awards.
 
 
 3
 The parties were unable to reach agreement. Consequently, the court held a hearing to determine the appropriate level of back pay and attorney's fees. It then made supplemental findings and conclusions, entered judgment in favor of plaintiff for $89,236.15, plus costs, and attorney's fees in the amount of $5,115.00. 508 F.Supp. 302. The appeal and cross-appeal followed.
 
 
 4
 * Defendant operates a large chain of retail stores. During the time of plaintiff's employment, most of the stores sold prescription drugs, over-the-counter drugs, and sundries. The organizational district containing the stores in which plaintiff worked consisted of ten stores.
 
 
 5
 Management in each of defendant's stores consisted of a general manager who was responsible for the entire store; an assistant general manager directly responsible for the drug sales area which constituted the bulk of the sales floor in each store and who was responsible for the entire store in the general manager's absence; and a lobby manager who was directly responsible for candy, tobacco, and film counters which were usually located in the front of the store beyond the line of checkout counters. The lobby manager ordered merchandise, organized displays, and scheduled employees for work in his area. Defendant's stores were staffed by clerks assigned to each area. A district manager oversaw the operations of a number of different stores.
 
 
 6
 Promotions to the lowest managerial position were usually made from among the clerks. Lobby managers could be promoted to assistant general managers and assistant general managers to general managers. Promotion usually also meant transfer to another store in defendant's chain. Recommendations for promotion or demotion were made by a store's general manager, sometimes accompanied by an assistant general manager's recommendation, to the district manager. Recommendations were always made orally. Defendant had no formal employee evaluation procedure; there were no written, objective standards or tests.
 
 
 7
 District managers forwarded recommendations from general managers to defendant's home office in Salt Lake City for approval or disapproval. During the time of plaintiff's employment, the district manager supervising the stores in which he worked was Arnold Ford. Ford testified that he consistently supported recommendations made by the general managers under his supervision.
 
 II
 
 8
 The trial court's findings on plaintiff's claim were essentially as follows:
 
 
 9
 Plaintiff, a Mexican-American, began his employment with defendant as a clerk at defendant's Store No. 22 during the 1965 Christmas season. In January 1966 plaintiff accepted full-time employment as a clerk in that store. Store 22's general manager was then Gus Roe. Plaintiff worked through 1966 as a sales clerk. During 1966 Eldred Jensen became general manager of Store No. 22. In late 1966 or early 1967 plaintiff was involuntarily reassigned by Jensen to the shipping department.
 
 
 10
 In February 1968 Robert Benedict, general manager of defendant's Store No. 50, told Jensen that he needed a shipping clerk. Jensen reassigned plaintiff to Store No. 50. Plaintiff spent one year in the shipping department at Store No. 50, and in early 1969 plaintiff requested and received reassignment to the sales floor.
 
 
 11
 Benedict eventually recommended plaintiff to Ford for promotion. In November 1969 plaintiff was named lobby manager and reassigned to Store No. 22 where Jensen was still general manager. In April or May 1970, Store No. 22's then assistant general manager was replaced by Coleman Nay. Jensen and Nay worked as general manager and assistant general manager over plaintiff until plaintiff was fired as lobby manager.
 
 
 12
 On September 17, 1971, plaintiff was called to Jensen's office to meet with Ford and Jensen. Ford ordered plaintiff to surrender his keys to the store and informed him that he was no longer a lobby manager. Ford testified that these actions terminated plaintiff's employment with defendant.[3] Ford, Nay, and Jensen had participated in the decision to dismiss plaintiff. Nay and Jensen both told Ford that plaintiff was performing poorly as lobby manager. Based on their opinions, Ford recommended plaintiff's termination to his superiors. With their approval, Ford dismissed plaintiff. When plaintiff asked why he was being fired, Jensen told him that, in his opinion, he would never be able to handle the position of general manager at one of defendant's stores. Plaintiff asked for reassignment to another position in defendant's organization, and Ford sent him to work in defendant's central Denver warehouse.
 
 
 13
 Plaintiff remained as a warehouseman with defendant until his resignation on June 8, 1973. Plaintiff gave as the reason for his resignation his inability to support his family on his wages. Plaintiff held part-time jobs until he found full-time employment with Gold Star Beef Company. A 1975 on-the-job back injury at Gold Star, however, resulted in his temporary total disability and he currently has a partial disability. Plaintiff now resides in Mesa, Arizona, in part for health reasons.
 
 
 14
 In explaining its rulings, the trial court first found that defendant failed to articulate a legitimate, nondiscriminatory reason for plaintiff's dismissal to rebut the inference raised by plaintiff's prima facie showing of discrimination. The court based this finding upon its judgment that the testimony of defendant's witnesses Jensen and Nay as to a nondiscriminatory reason for their recommendations of dismissal was not credible. The court found that Jensen's testimony that plaintiff lacked good business sense was both unsupported and highly subjective. The specifics of Nay's testimony that plaintiff simply did not do his job were contradicted by plaintiff's witnesses, whom the court found to be credible, and defendant's attempts to impeach plaintiff were unsuccessful. Thus, the court found that the testimony offered by defendant purporting to establish a legitimate, nondiscriminatory reason for plaintiff's dismissal was not credible. (I R. 81-83).
 
 
 15
 Alternatively, the court found that even if defendant did articulate a legitimate reason for plaintiff's dismissal, plaintiff had rebutted the defense case by showing that defendant discriminated against him in making its decision to discharge him. The court found that although testimony from defendant's numerous Hispanic witnesses established that defendant had no company-wide policy of discrimination against Hispanics, this was of little comfort to plaintiff for it appeared that discrimination "played a major part in his firing-demotion," I R. 84, and he was not claiming a company-wide policy of discrimination. The court found as a fact that both Jensen and Nay used racial slurs in referring to Blacks, that both of them made ethnic jokes, some of which were directed at plaintiff and his wife, and that Nay had a history of problems with members of minority groups, both employees and customers. Defendant contested much of plaintiff's evidence regarding these matters, but the court resolved questions of credibility in favor of plaintiff and ultimately found that Jensen and Nay made their recommendations that plaintiff be dismissed as a result of their prejudice against him as a Mexican-American. (I R. 83-85).
 
 
 16
 The court's findings regarding the circumstances of plaintiff's dismissal buttressed the inference of discrimination. Neither Jensen nor Nay discussed with plaintiff the deficiencies in his performance which they said were responsible for his dismissal; none of defendant's officers or supervisory employees warned defendant that his position was in jeopardy; and plaintiff received no reprimand, warning, or counselling on how to improve. Hence the court determined that defendant's claims of deficiencies in plaintiff's performance were merely pretextual.
 
 
 17
 The trial court found that the proof adduced to establish defendant's liability on the Title VII claim was also sufficient to establish his Sec. 1981 claim. In some instances the discriminatory intent required to establish Title VII liability is different than that required to establish Sec. 1981 liability. For a Title VII claim of disparate impact of employment practices, the required intent is less than that for a Sec. 1981 claim. The court found that for this disparate treatment claim, the intent proven for the Title VII claim was sufficient to establish liability under Sec. 1981 as well.
 
 III
 
 18
 For reversal, defendant first contends that the trial judge erred by completely misapplying the burden of proof in a Title VII disparate treatment case, that he shifted the burden of proving nondiscrimination to defendant, and that he failed to consider overwhelming evidence produced by defendant showing that plaintiff was dismissed for a nondiscriminatory reason. We find no merit in these contentions.
 
 
 19
 A prima facie Title VII claim here required a showing that plaintiff (1) is a member of a protected group, (2) he was qualified for the position from which he was dismissed, (3) he was removed from that position, and (4) he was replaced by someone not a member of the protected group. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1094 n. 6, 67 L.Ed.2d 207. The trial judge found that plaintiff had presented a prima facie case by his evidence that he is a Mexican-American, was qualified to be a lobby manager, was terminated, and was replaced by a white male. (I R. 80). The burden then shifted to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge. All that defendant need do to rebut plaintiff's prima facie case is produce evidence that there was indeed a legitimate reason for plaintiff's discharge. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. See Verniero v. Air Force Academy School District No. 20, 705 F.2d 388 (10th Cir.1983); Mohammed v. Callaway, 698 F.2d 395, 399 (10th Cir.1983).
 
 
 20
 Defendant says that its witnesses did articulate a legitimate, nondiscriminatory reason for the treatment of plaintiff; in essence, that plaintiff was dismissed because he was not performing well enough as lobby manager to continue in the management of defendant's stores. (I R. 81).[4] Defendant argues that the trial court fundamentally erred by holding that:
 
 
 21
 [T]o carry its burden, the defendant must present evidence that is at least credible. Since Skaggs has not presented credible evidence, it has not articulated any legitimate, nondiscriminatory reason for dismissing Mr. Whatley. Therefore, Skaggs has failed to rebut Whatley's prima facie case of discrimination, and Whatley should prevail. (I R. 83).
 
 
 22
 We agree that under the explanation on the procedural steps made in Burdine, 450 U.S. at 254-55, 101 S.Ct. at 1094-1095, decided after the trial court's ruling, it seems that there was an error in reasoning at this point when the trial court said defendant had not produced "credible" evidence to rebut the prima facie case and that plaintiff should prevail. This analysis seems at odds with the Supreme Court's statements in Burdine defining the burden of the defendant in meeting the prima facie case of the plaintiff: "The defendant need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254, 101 S.Ct. at 1094.
 
 
 23
 However, the trial judge foresaw this procedural problem and went on to hold alternatively that:
 
 
 24
 Even if Skaggs had sufficiently articulated a legitimate reason, Whatley has rebutted the defense case by showing that Skaggs discriminated against him in making its decision to discharge him. (I R. 83).
 
 
 25
 Thus the ultimate burden was left on the plaintiff and the court made the critical findings for the plaintiff under the proper standard. As has been recently made clear, after the defendant failed to persuade the trial judge to dismiss for lack of a prima facie case, (see III R. 300, 303), and the defendant responded by offering evidence of the reason for the plaintiff's dismissal, the McDonnell-Burdine presumption actually dropped from the case and the court was in a position to decide the ultimate factual issue, as the trial judge did here. See United States Postal Service Board of Governors v. Aikens, --- U.S. ----, 103 S.Ct. 1478, 1480, 75 L.Ed.2d 403. In view of the alternate finding of the trial court for the plaintiff on the ultimate issue, with the burden properly placed on the plaintiff, there was no reversible error.
 
 
 26
 Under this proposition defendant also argues that the trial court failed completely to consider "overwhelming" evidence showing that plaintiff was dismissed for a nondiscriminatory reason, citing at length the defense testimony of shortcomings by plaintiff in his work. See Brief of Appellant Skaggs Co., Inc., at 19-24. However, the trial judge discussed such testimony and weaknesses which he felt were apparent in it. I R. 81-82. The judge also pointed to testimony by witnesses for the plaintiff contradicting the defense evidence. I R. 82-83. We are satisfied that the trial court carefully considered all the evidence and its findings should not be set aside unless clearly erroneous, with regard being given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), F.R.Civ.P., Gutierrez v. Denver Post, Inc., 691 F.2d 945, 946 (10th Cir.1982). Moreover the clearly erroneous standard applies to the ultimate findings of the trial court in a Title VII action. Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66; Verniero v. Air Force Academy District 20, 705 F.2d 388 (10th Cir.1983).
 
 
 27
 Similarly, defendant says that the trial judge erred in not finding that the defense evidence of comparative treatment of other Hispanics rebutted any inference of disparate treatment of plaintiff, in failing to consider defendant's evidence contradicting testimony on Nay's ethnic prejudice, and in ignoring other evidence on important points. The evidence on treatment of other Hispanics was considered, but the court found it "simply not responsive." I R. 84. We agree the evidence was admissible and relevant but cannot say there was error in the findings. The weighing of all the contradictory evidence, such as is detailed at length in the Appendix to the Brief of Appellant, was for the trial judge. We are not persuaded that he erred in his consideration of the case or in his findings.
 
 
 28
 In sum the defendant has demonstrated no reversible error in the findings and analysis of the trial court.
 
 IV
 
 29
 Defendant argues that the trial court erred by admitting in evidence a Determination dated January 30, 1975 by the District Director of the Equal Employment Opportunity Commission (EEOC), adverse to the company. (See Plaintiff's Exhibit 3). More specifically, the company argues that admission of the Determination was error because it prominently reported a 1975 incident which was irrelevant to the alleged discriminatory action by the company in 1971; the use of the report in effect denied the company's right to trial de novo by the district court on the Title VII claim; and the Determination included inadmissible hearsay findings and conclusions by the agency.
 
 
 30
 The Determination, consisting of three typewritten single spaced pages, reported on the investigation by the District Director of plaintiff's discrimination charge. It reported on the lack of reprimands and the lack of records of any deficiency in the charging party's job performance. The report reviewed generally some facts in the employment records pertaining to good performance by the charging party and it summarized testimony from some witnesses. Further the Determination stated that substantial weight had been accorded to the state agency's findings relating to the subject charge. The Determination concluded that there was reasonable cause to believe that the respondent had violated Title VII and stated that a notice of conciliation process was enclosed.
 
 
 31
 We must agree that the admission of the evidence raises a substantial question, but are not persuaded there was any reversible error. First, the 1975 incident reported concerned an observation by an investigator of a picture of Dr. Martin Luther King with an unusual inscription.[5] The question of admissibility due to possible remoteness and irrelevance would be a matter for the trial judge's discretion, and an abuse of discretion is not shown. Second, the argument that admission of the Determination infringed the company's right to a trial de novo by the court is unpersuasive. The report was not relied on in the trial judge's opinions and he independently reviewed the evidence in detail and stated his own findings and conclusions.
 
 
 32
 Third, we feel that a more serious question is theoretically involved concerning the hearsay objection. We must agree that admission of such a report with its cumulation of hearsay and observations by the investigator, and its reference to investigation by still other parties, appears to be in error. See Cox v. Babcock and Wilcox Co., 471 F.2d 13, 15 (4th Cir.1972); Smith v. Universal Services, Inc., 454 F.2d 154, 160-61 (5th Cir.1972) (Dyer, Circuit Judge, dissenting); cf. Gillin v. Federal Paper Board Co., Inc., 479 F.2d 97, 99 (2d Cir.1973). Nevertheless we find no reversible error in the admission of the exhibit. In his ruling admitting Exhibit 3 and Exhibit 12, not in question, the trial judge stated (III R. 299-300):
 
 
 33
 I'm going to admit these two exhibits for whatever value they may have in this case, if any, but I assure you that I am concerned primarily with the evidence here under oath and I'm not going to give a whole lot of weight, if any, to somebody else's previous determinations in a case that's not heard in my court.
 
 
 34
 The judge thus clearly showed that his interest was focused on the evidence given under oath and that he would give slight attention to the Determination. Moreover, as noted above, the two written opinions of the judge contained no reference to the report. In these circumstances we are satisfied that any error in the admission of the Determination was harmless error, not affecting the substantial rights of the company. See 28 U.S.C. Sec. 2111.
 
 V
 
 35
 Defendant strenuously objects to the order for plaintiff's reinstatement to a position equivalent to that from which he was dismissed in 1971. The company says that the plaintiff never requested reinstatement and that the court ignored his physical disability in granting such relief.
 
 
 36
 We find no merit in these contentions. The court may fashion an order in such cases to eliminate the effects of discrimination and to restore the plaintiff to the position he would have held but for the discrimination, and such equitable relief may be provided, even if it was not sought in the pleadings. See Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 957 (10th Cir.1980); Sias v. City Demonstration Agency, 588 F.2d 692, 696 (9th Cir.1978). Moreover the trial court did consider the facts pertaining to disability and the duties performed by plaintiff. The responsibilities of his job as lobby manager were developed on cross-examination of plaintiff by defense counsel. III R. 233-35.
 
 
 37
 The fact of his disability was stated several times in the court's findings which concluded that he currently has a partial disability. I R. 80, 87; I R. 134. The court stated that plaintiff's disabling back injury, suffered in his new strenuous physical labor, would not have occurred had defendant not terminated him as lobby manager. I R. 134 n. 1.
 
 
 38
 We find no error or abuse of discretion in the relief afforded to plaintiff.
 
 VI
 
 39
 Defendant next contends that the trial court erred by awarding back pay to plaintiff for any time period after his resignation from defendant's employ in June 1973. Defendant says that plaintiff then voluntarily resigned; that an award of back pay is improper because it did not constructively discharge plaintiff in that the company did not demote or transfer plaintiff in an attempt to force his resignation, citing Muller v. United States Steel Corp., 509 F.2d 923, 929 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), and Bourque v. Powell Electrical Mfg. Co., 617 F.2d 61 (5th Cir.1980); and that only during the period from plaintiff's termination as lobby manager to his voluntary resignation, 1971 to 1973, was plaintiff damaged by defendant's discrimination.
 
 
 40
 As the trial court found, however, this case raises no issue of constructive discharge. I R. 88. The court found that Ford's testimony established that plaintiff was terminated--fired--on September 17, 1971, as lobby manager. The only reason that plaintiff continued in defendant's employ was that he requested that defendant give him some sort of job. The trial court found that "in these circumstances, Whatley's tenure in the Skaggs warehouse has the same legal effect as if he had permanently left Skagg's employ on September 17, 1971, and had found employment elsewhere, later the same day." Id. We agree. Therefore, it was within the court's discretion to award plaintiff back pay for the period subsequent to June 1973.
 
 VII
 
 41
 Defendant says that the trial court erred in its calculation of the award of back pay to plaintiff: that plaintiff is not entitled to back pay for the period from 1975 to 1980 when he was disabled and was not seeking employment, and that the trial court erroneously failed to deduct plaintiff's disability benefits from its back pay liability.
 
 
 42
 Title 42 U.S.C. Sec. 2000e-5(g) leaves to the discretion of the trial court the amount of back pay to be awarded a successful plaintiff in an employment discrimination action. Absent an abuse of that discretion, the appellate court will not disturb the trial court's determination. Comacho v. Colorado Electronic Technical College, 590 F.2d 887, 888 (10th Cir.1979); Taylor v. Safeway Stores, Inc., 524 F.2d 263, 267 (10th Cir.1975). It is true that the statute does reduce allowable back pay awards by any amount earnable by a discharged plaintiff with reasonable diligence[6] and that the plaintiff has a duty to mitigate his damages, presumably by seeking employment elsewhere. United States v. Lee Way Motor Freight, 625 F.2d 918, 936-38 (10th Cir.1979); see Equal Employment Opportunity Commission v. Sandia Corp., 639 F.2d 600, 627 (10th Cir.1980). It is also true, however, that plaintiff here worked both full and part time jobs from his 1971 dismissal by plaintiff until 1975,[7] and he was disabled from 1975 to 1980. Further, mitigation requires not success in finding alternate employment, but only a reasonable exertion to mitigate damages. Lee Way, 625 F.2d at 937. Under these circumstances, we find no abuse of discretion in the trial court's refusal to reduce defendant's back pay liability as requested.[8]
 
 
 43
 The trial court's refusal to deduct plaintiff's disability benefits from defendant's back pay liability is likewise not error. Such benefits are from a collateral source, and offset is not required. See Equal Employment Opportunity Commission v. Sandia, 639 F.2d 600, 624-26 (10th Cir.1980); Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730, 736 (5th Cir.1977).
 
 VIII
 
 44
 Defendant argues that the trial court erred in holding that liability was also established under Sec. 1981. It contends that the court was in error in applying the six-year Colorado statute of limitation of C.R.S.1973 Sec. 13-80-110 and in holding that the test for liability under Sec. 1981 was the same as for the Title VII claim involved here.
 
 
 45
 We are convinced that the district court properly rejected these same arguments in its thorough treatment of them. See 502 F.Supp. at 376-77. The statute of limitations issue in connection with such a Sec. 1981 claim is clearly settled in Zuniga v. Amfac Foods, Inc., 580 F.2d 380 (10th Cir.), as the trial judge noted. The claim may be asserted under Sec. 1981 for such discrimination in employment and the six-year Colorado limitation was correctly applied.[9] Moreover the type of Title VII claim upheld here was for disparate treatment. We agree with the trial judge that a successful claim for such intentional discrimination supports Sec. 1981 liability as well, in accord with the principles governing such constitutional claims noted in Washington v. Davis, 426 U.S. 229, 238-248, 96 S.Ct. 2040, 2046-2051, 48 L.Ed.2d 597. See also T & S Service Assoc., Inc. v. Crenson, 666 F.2d 722, 724 (1st Cir.); McWilliams v. Escambia County School Bd., 658 F.2d 326, 331-32 (5th Cir.).
 
 IX
 
 46
 Plaintiff asserts three claims of error regarding the trial court's calculation of back pay due him in its supplemental findings and order. First he says that the court erred by offsetting monies he earned from part-time employment from his back pay award. In determining plaintiff's back pay award, the court reduced the award by $14,329.79, the amount plaintiff had earned between 1971 and 1974, while still working full time at defendant's warehouse and then at Gold Star Beef, by "moonlighting" at Dillon Companies and then at Denver School District No. 1.
 
 
 47
 Title 42 U.S.C. Sec. 2000e-5(g) provides, "Interim earnings ... by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." Moonlighting earnings will be considered "interim" earnings and offset against a successful plaintiff's back pay award if he would have been unable to hold the moonlighting job at the same time as the job he lost because of discrimination. Bing v. Roadway Express, Inc., 485 F.2d 441, 454 (5th Cir.1973).[10] The trial court properly found plaintiff's moonlighting earnings to constitute interim pay based on plaintiff's testimony both at trial and at the supplemental hearing that as lobby manager he worked ten to twelve hours a day, six or seven days a week; defendant did not require plaintiff to work more than a five day, forty hour week, but the responsibilities of his management position and the incentives of promotion and larger bonuses create the likelihood that plaintiff would have continued to work long hours had he remained a lobby manager, and he would consequently have been unable to moonlight. (See I R. 134; Supplemental Volume I R. 7-8).[11] The trial court's set-off was therefore not error.
 
 
 48
 Second, Plaintiff says that the trial court erred by failing to include an amount equal to his profit sharing account in defendant's profit sharing plan in his back pay award. The trial court refused such an award on the grounds that plaintiff's profit sharing rights terminated not when plaintiff was dismissed as lobby manager, but when plaintiff quit his warehouse job with defendant because of his low salary before his profit sharing rights had vested; thus, plaintiff lost his profit sharing rights by voluntarily leaving his warehouse job for reasons not directly related to any act of discrimination by defendant. Further, defendant received no benefit from plaintiff's forfeited funds; plaintiff's account was merely redistributed among the accounts of other employees of defendant. (I R. 135-36).
 
 
 49
 As both the trial court and defendant recognize, monetary benefits from profit sharing plans may properly be made part of a successful plaintiff's back pay award under Title VII. See EEOC v. Kallir, Phillips, Ross, Inc., 401 F.Supp. 66, 74 (S.D.N.Y.1975), aff'd mem., 559 F.2d 1203 (2d Cir.), cert. denied, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); Plaintiff-Appellant's Brief in Chief at 10. We find no error in the finding that plaintiff forfeited his profit sharing rights by resigning before they had vested. See Supplemental Volume I R. 57. Plaintiff and defendant stipulated to this fact. (I R. 119). In these circumstances, and in view of the trial court's broad discretion in these matters, we find no error in the court's declining to award plaintiff an amount equal to his profit sharing account with defendant.
 
 
 50
 Finally, plaintiff contends that the trial court erred by failing to award interest on the back pay award. Plaintiff argues that absent an award of interest, the high rate of inflation of the period 1971-1981 would reduce the value of the back pay award so as to thwart Title VII's purpose of making whole those discriminated against in employment.
 
 
 51
 We agree that in a proper case interest is an allowable part of a back pay award. See United States v. Lee Way Motor Freight, Inc., 625 F.2d 918, 940 (10th Cir.1979). Further, the purpose of Title VII is indeed to make whole the victims of unlawful employment discrimination. Title VII however, does not specifically provide for interest on a back pay award; interest is within the discretion of the trial court.[12] Here at the supplemental hearing, plaintiff requested interest on back pay. (Supplemental Volume I R. 55). Yet, without further discussion in the record and without any mention of interest in the supplemental order fixing the amount of the back pay award, the trial court simply granted no interest. Plaintiff has requested a remand for consideration of the interest question and we feel this is proper. On remand the trial court may consider the circumstances and should make findings and a determination on the propriety of awarding interest and the proper award, if the court finds that interest should be awarded.
 
 
 52
 The plaintiff has also requested an award of attorney's fees on appeal. Since he has prevailed on most issues such an award seems proper.[13] On remand, the trial court should afford a hearing on this matter and make proper findings and an award of reasonable attorney's fees for the appeal.
 
 
 53
 Accordingly the judgment is affirmed except that the interest and appellate attorney's fee matters will be determined on remand as provided herein.
 
 
 
 [1]
 42 U.S.C. Secs. 2000e--2000e-17 deal with equal employment opportunities. 42 U.S.C. Sec. 2000e-2(a)(1) provides:
 It shall be an unlawful employment practice for an employer--to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
 
 
 [2]
 42 U.S.C. Sec. 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [3]
 There is some dispute as to whether Ford's actions, in view of plaintiff's continued employment with defendant as described below, constituted dismissal or merely demotion. The trial judge characterizes the action as termination of employment, followed by rehiring. (I R. 79-80). Defendant characterizes the action taken as a demotion. (Brief in Chief of Appellant at 10-11). For purposes of Title VII liability, the proper characterization is immaterial. Be it dismissal or be it demotion, if defendant's action in relieving plaintiff of his status as a lobby manager was motivated by plaintiff's Mexican-American ancestry, defendant's action was unlawful. For purposes of awarding back pay to plaintiff, however, the characterization assumes importance. Based upon our review of the record, including Ford's, Nay's, and Jensen's testimony, we accept the conclusion of the trial judge that plaintiff was terminated by Ford's action on September 17
 
 
 [4]
 Defendant offered evidence by Ford, Nay, and Jensen as to plaintiff's poor performance as a lobby manager. Our examination of the record discloses that the evidence was sufficiently specific to constitute a proper articulation of a legitimate reason for plaintiff's dismissal. See I R. 81-83. Burdine requires that in fairness to plaintiff, defendant's evidence regarding its reason for plaintiff's dismissal must be reasonably specific. 450 U.S. at 258, 101 S.Ct. at 1096
 
 
 [5]
 The picture bore an inscription "To Eldred with Love, Martin." The manager, Mr. Jensen, was asked about the authenticity of the inscription and the report says he replied that it was "phoney, kind of a joke."
 
 
 [6]
 42 U.S.C. Sec. 2000e-5(g) provides, in part: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."
 
 
 [7]
 The court found that after he suffered his disability in November, 1975, plaintiff had no employment during 1976, 1977, and 1978, and substantially no employment during 1979 and 1980. (I R. 132-33). The court found no bad faith failure to mitigate damages during those years, nor did it find that plaintiff was able to secure employment "through reasonable diligence." Plaintiff continues to draw Social Security disability benefits. See II R. 139, X R. 19
 
 
 [8]
 The trial court also expressly rejected a reduction of defendant's back pay liability based on plaintiff's disability, saying:
 Here, Whatley would not have suffered his disabling back injury had Skaggs not terminated him as lobby manager. Skaggs' act of discrimination forced Whatley from his management position to blue-collar jobs that required strenuous physical labor resulting in injury to his back.
 I R. 134 n. 1.
 
 
 [9]
 Plaintiff's Sec. 1981 claim is grounded on allegations of racial discrimination affecting his employment relationship and his demotion from his position as an assistant manager. This is sufficient to come within the ambit of Sec. 1981 which "affords a federal remedy against discrimination in private employment on the basis of race." Johnson v. Railway Express Agency, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295; and see Manzanares v. Safeway Stores, Inc., 593 F.2d 968 (10th Cir.)
 
 
 [10]
 In Bing, 485 F.2d at 454, the court stated:
 If a supplemental or moonlight job is one that the discriminatee cannot perform when he wins his new position, the supplemental job is necessarily temporary, provisional or "interim". By contrast, if one can hold his supplemental job and his desired full-time job simultaneously and there is reason to believe he will do so, the supplemental job assumes a permanent rather than interim nature. Those earnings would be independent of the position sought and should not be taken into account in back pay calculations.
 
 
 [11]
 Plaintiff testified at the supplemental hearing that as a lobby manager he could have moonlighted. He admitted, however, that at no time during his tenure as lobby manager did he in fact do so. (Supplemental Volume I R. 8)
 
 
 [12]
 See Goodwin v. City of Pittsburgh, 480 F.Supp. 627, 635 n. 3 (W.D.Pa.), aff'd without opinion, 624 F.2d 1090 (3d Cir.1980)
 
 
 [13]
 See Marks v. Prattco, Inc., 633 F.2d 1122, 1125-26 (5th Cir.1981); Lowry v. Whitaker Cable Corp., 472 F.2d 1210 (8th Cir.1973)